ILLINOIS EMCASCO INSURANCE COMPANY, Plaintiff-Appellee and Cross-Appellant, v. CONTINENTAL CASUALTY COMPANY, Defendant-Appellant and Cross-Appellee.

First District (4th Division)   No. 84—2432

Opinion filed December 12, 1985.

Haskell & Perrin, of Chicago (H. Russell Barefield and Philip R. King, of counsel), for appellant.

Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll and Lloyd E. Williams, Jr., of counsel), for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

This is an appeal by the defendant, Continental Casualty Company (CNA), from a trial court order requiring CNA to return to the plaintiff, Illinois Emcasco Insurance Company (Emcasco), the sum of $42,363.64 plus interest. This sum represents the difference between the amount Emcasco contributed in satisfaction of the judgment of the underlying action and the reduced *pro rata* share that the trial court determined Emcasco was required to contribute. To determine whether this allocation was correct, we must in this appeal establish the priority of secondary liability between the CNA and Emcasco policies.

The underlying action arose when Warren Kolber, driver of a car owned by Clark C. King, Jr., was involved in an automobile accident. Kolber was driving the automobile with King's permission. Kolber's two passengers were injured and consequently sued Kolber for damages. Two judgments totalling $2,034,000 were entered against Kolber.

Both Kolber and King were insured against such an accident. King was insured by State Farm Mutual Insurance Company (State Farm) and by CNA. State Farm provided coverage to King and other persons operating King's automobile with King's permission. The amount of coverage was $300,000 for each person injured with a cumulative limit of $300,000 per accident. State Farm paid the $300,000 toward the judgment and is not a party to this action.

King was also insured under an umbrella excess third-party liability policy issued by CNA to Lord, Bissell & Brook and a personal umbrella endorsement naming King as an additional insured. To be effective, the policy requires the presence of an underlying primary automobile insurance policy in the amount of $300,000. The umbrella endorsement provides excess coverage up to $2,000,000 for any one occurrence over and above the amount recoverable from the specified underlying primary policy. The policy also covers any person operating an automobile owned by King with King's permission. Consequently, Kolber was also an insured under this policy.

Kolber was also an insured under a policy issued by Emcasco to Kolber's father, Sheldon Kolber. The Emcasco policy provides coverage to residents of Sheldon Kolber's household who operate automobiles owned by Sheldon or owned by another person. The limit of liability under the Emcasco policy was $100,000 for each person with a per occurrence limit of $300,000. Thus, the Emcasco policy potentially provided $200,000 in coverage for this accident. Pursuant to ·

an agreement between Emcasco and CNA, Emcasco deposited $200,000 with CNA to be applied to the $2,034,000 judgment against Kolber. CNA satisfied the remaining amount of the judgment, $1,534,000.

Both the CNA and Emcasco policies contain what are referred to as "other insurance" clauses. Generally, these clauses are of two types, excess or escape. An "excess" clause provides coverage only in excess of another insurance policy and an "escape" clause provides no coverage if another valid and collectible policy also provides coverage. (See generally 8A Appleman, Insurance Law & Practice secs. 4909, 4910 (1981).) The other insurance clause contained in the Emcasco policy provides that "the insurance with respect to a *** non-owned automobile shall be excess over any valid and collectible insurance." CNA's other insurance clause also stated that its coverage was to be in excess of any other policy.

After depositing the $200,000 with CNA, Emcasco filed a declaratory judgment action and argued that the other insurance clause contained in its policy should be construed as excess to the one contained in the CNA policy and that therefore, Emcasco was not required to contribute to the judgment until the limit of liability under the CNA policy was exhausted. The trial court ruled favorably on Emcasco's alternative argument that the two other insurance clauses are irreconcilable and that therefore coverage under each policy should be applied *pro rata* in proportion to their liability limits.

After determining that the policies should share on a *pro rata* basis of $2,000,000 to $200,000, the trial court deducted the $300,000 contributed by State Farm and held that CNA's share of the liability was ten-elevenths or $1,576,363.64, and Emcasco's share was one-eleventh or $157,636.36. Because Emcasco had deposited $200,000 with CNA, the trial court ordered CNA to return to Emcasco the difference between $200,000 and $157,636.36, $42,363.64.

■ On appeal, CNA argues that it should not be required to contribute toward the judgment on a *pro rata* basis because the CNA umbrella policy is secondary or in excess of the primary coverage provided by Emcasco. Therefore, CNA argues, the limit of liability under the Emcasco policy must be exhausted before the CNA policy is reached. Emcasco essentially argues the converse. Emcasco argues that the umbrella policy should not be treated differently or elevated to a higher status, but rather, the court should, in resolving this issue, examine the "other insurance" clauses contained within the policies and apply the general rules thereto. We disagree. There are various recognized differences in general between an umbrella

policy and a primary policy containing an excess insurance clause and specifically between the policies before us. Instead of examining the individual other insurance clauses, we believe we must construe the policies as a whole and the underlying policy considerations.

First, an umbrella policy, in contrast to a primary policy that contains an other insurance clause, has been recognized as providing unique and special coverage. The synonym "catastrophe" that is used to identify this type of policy supports this assertion. (See 8A Appleman, Insurance Law & Practice sec. 4906 (1981).) Umbrella or catastrophe coverage has been defined as

> "*** [A] needed form of coverage which picks up, above the limits of all other contracts, such as automobile and homeowners coverages, to give the security and peace of mind so necessary today where jury verdicts, or court awards, may be very substantial, to discharge the unexpected, but potentially bankrupting, judgment."

> "The courts are not ignorant of [these] desirable socio-economic consequences attendant upon the providing of umbrella or catastrophe coverages." 8A Appleman, Insurance Law & Practice sec. 4906, at 348; sec. 4909.85, at 452 (1981).

An examination of the premiums generally charged for umbrella coverage also reflects an intent that umbrella policies serve a different function. Generally, "[t]he premium is comparatively small, for the size of the risk, so that the company cannot be expected to prorate with other excess coverages; and public policy should not demand that this be done." (8A Appleman, Insurance Law & Practice sec. 4906, at 348 (1981).) In this case, the Emcasco premium was $535.74 per year for coverage of $100,000 for each person with a per occurrence limit of $300,000. In contrast, the CNA premium was $49 for coverage up to $2,000,000 for any one occurrence. We believe this disparity in premiums is indicative of the reduced risk assumed by the umbrella policy.

Finally, in contrast to the Emcasco policy, the CNA policy remains an umbrella policy in all instances except under limited circumstances where the policy provides for primary coverage. The Emcasco policy, however, provides primary coverage in almost all regards. In only one instance, namely, with respect to a judgment involving a nonowned automobile, does the Emcasco policy provide excess coverage. Moreover, unlike the Emcasco policy, a condition to coverage under the CNA policy was the procurement of underlying insurance coverage, which in this case was supplied by State Farm.

■■ ■ For these reasons, we believe that the two policies cannot

be considered on the same level nor can the general rules regarding excess and escape clauses be applied. Rather, taken as a whole, we find that the umbrella policy issued by CNA should be required to contribute only after the limits of the Emcasco policy have been reached. We are in agreement with the Appleman treatise on insurance where, in discussing "other insurance" clauses, he states:

"There is, however, a unique form of excess contract which always remains excess over and above all other applicable forms of contract, except as to the specific risks upon which it may elect to carry the primary burden. That is the umbrella or catastrophe policy. *** [U]mbrella coverages, almost without dispute, are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses." 8A Appleman, Insurance Law & Practice sec. 4906, at 348; sec. 4909.85, at 453-54 (1981).

We recognize that our analysis in this case conflicts with the case of *Home Insurance Co. v. Certain Underwriters' at Lloyds, London* (7th Cir. 1984), 729 F.2d 1132, wherein the Seventh Circuit employed the general rules applicable to excess and escape clauses in the context of an excess policy. Nevertheless, we are not persuaded by the *Home* decision nor are we bound to follow it. Accordingly, we reverse the trial court order requiring CNA and Emcasco to contribute on a *pro rata* basis to the satisfaction of the judgment.

The order of the trial court is reversed.

Order reversed.

JOHNSON and LINN, JJ., concur.