In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1934 & 00-2055

Transportation & Transit
Associates, Inc.,

Plaintiff-Appellee, Cross-Appellant,

v.

Morrison Knudsen Corporation,

Defendant-Appellant, Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 2827--George W. Lindberg, Judge.

Argued November 7, 2000--Decided June 25, 2001

   Before Bauer, Coffey, and Easterbrook,
Circuit Judges.

   Easterbrook, Circuit Judge. Transportation
& Transit Associates (tta) worked as a
subcontractor for the railcar manufacture
and repair division of Morrison Knudsen
Corp. (mkc). A disagreement between the
firms was resolved in 1993 by a contract
promising tta at least $15 million in
business over the next five years, plus
status as "a most preferred vendor" for
other work. A downturn in its business
caused mkc financial distress: it lost
$350 million in 1994 and decided to spin
off its rail operations, the principal
cash drain. In 1995 mkc divested its
transit division to American Passenger
Rail Car Company, llc (Amerail), which was
formed and funded by firms that had
issued surety bonds for mkc's transit
contracts. mkc delegated to Amerail the
obligation to tta--but tta was not asked
for, and did not consent to, a transfer
of mkc's responsibilities under the
contract. Amerail hired tta for some work,
but not as much as the contract required.
Near the end of the five-year term tta
sued both mkc and Amerail under the
diversity jurisdiction. Amerail failed to
answer the complaint; a default judgment
was entered, and it has dropped out of
the case. On cross-motions for summary
judgment the district court ruled that mkc

is liable to tta for failing to meet the award-value requirements of para.3 in the contract, but is not liable for breach of the most-preferred-vendor undertaking in para.4. 1999 U.S. Dist. Lexis 2551 (N.D. Ill. Feb. 23, 1999). The judgment of some $863,000 in tta's favor reflects the parties' agreement about damages (given the court's rulings on liability), to which the judge added about $74,000 in prejudgment interest. 2000 U.S. Dist. Lexis 3070 (N.D. Ill. Mar. 7, 2000). Both sides have appealed.

The parties treat this as a dispute about the meaning of para.3 and para.4 in their contract, rather than about the branch of contract law devoted to delegation of duties. See E. Allan Farnsworth, 3 Farnsworth on Contracts sec. sec.  11.1, 11.10-11.11a (2d ed. 1998); Restatement (2d) of Contracts sec. 318 (1979). The district court applied the contract law of Illinois, and as neither party protests on appeal we do likewise. We analyze the contract in light of the principle (present in Illinois law) that "an effective delegation does not relieve the delegating party [mkc] of its duty; that requires either consent by the obligee [tta] or performance by the delegate [Amerail]." Farnsworth at sec. 11.10 page 125. See also Restatement sec. 318(3); 810 ILCS 5/2-210(1) ("No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.").

Here is what the parties agreed in 1993:

3. AGREEMENT FOR FUTURE WORK: mkc agrees that, over the next five year period it shall contract with tta a work scope value of $15,000,000.00 largely to be performed by tta at Hornell or other reasonable location. The five year period shall commence on the date of execution of this Agreement. The scope of work shall be compatible with the business of tta at the time the future contract arises. The contract awards to tta shall be evenly distributed as much as reasonably possible on a value basis throughout the five year agreement period. tta agrees that its quality level and schedule performance shall be consistent with that of current

industry standards and mkc purchase requirements.

In the event mkc loses some of its current railcar projects and does not have other offsetting projects of the same approximate value, the workscope value shall be reduced proportionally.

In the event that mkc breaches this agreement for future work, it is agreed that because of the difficulty of accurately estimating the harm to tta, mkc shall pay to tta, as reasonable compensation, a fee of ten percent (10%) of the unawarded contract sum.

4. TTA AS MOST PREFERRED VENDOR: mkc agrees to treat tta as a most preferred vendor for other work over the next five (5) years.

mkc contends that plenty of words in this agreement are ambiguous, requiring a trial so that the parties can introduce evidence about industry customs, course of performance, and the negotiating history. It points particularly to the words "loses," "projects," "future work," and "future contract." But of these only the word "loses" (in subparagraph 2 of para.3) matters to liability; the others concern the quantum of damages, which have been stipulated. Unless the spinoff of the transit division reduced mkc's obligation to zero, it cannot avoid some liability. Only the proposition--mkc's principal argument on appeal--that by delegating performance to Amerail mkc "los[t all] of its current railcar contracts", so that a "proportional" reduction cuts the obligation to nothing, requires attention. And that proposition stretches language beyond the breaking point. Illinois does not apply the deconstructionist approach of Jacques Derrida to the law of contracts. mkc did not "lose" its book of railcar business; it gave that business away in order to stanch the flow of red ink. None of the evidence mkc wants to present would demonstrate that in the transportation business "lose" means the same as "sell" or "assign" or "delegate." The projects remained; the firms that had hired mkc still needed cars made or repaired; only the identity of the firm doing that work changed. What is more, para.3 refers to

the loss of "some of" the projects; provision for selling the whole line of business would have required different language. Thus mkc's argument implicitly challenges the principle that delegation of duties does not relieve the delegating party of its responsibility to keep its promises. Yet mkc does not take on that principle directly; it is entrenched in the law of contracts, and para.3 of this contract does not suggest its modification.

mkc advances four affirmative defenses: novation, waiver, estoppel, and laches. Note that it does not assert the statute of limitations: even if tta had cause for insecurity, and therefore could have brought suit as soon as mkc delegated performance to Amerail in 1995, see Central States Pension Fund v. Basic American Industries, Inc., No. 00-3920 (7th Cir. June 5, 2001), it sued in time under the ten-year period Illinois provides for written contracts. 735 ILCS 5/13-206. The availability of laches is legally doubtful. Does Illinois treat laches as a defense to an action seeking only damages? mkc does not point to such a precedent. Anyway, the defenses of estoppel and laches fail because mkc cannot explain how it suffered prejudice from tta's decision to delay filing suit until close to the end of the five-year agreement, when the amount of shortfall could be determined. What would mkc have done differently to reduce the damages had tta sued earlier? The contract does not contain a notice-and-cure clause; and mkc, having left the railcar business, was in no position to cure even if tta had started howling bloody murder in 1995. Actually tta's president did send a letter near the time of the assignment reminding mkc that tta would hold it to its promises, but this was unnecessary; promises are binding with or without reminders. The letter helps squelch mkc's claim that tta waived its entitlement to performance; a demand for performance is the polar opposite of waiver. And the plea of novation is hollow: mkc does not point to any document evincing tta's consent to have Amerail substituted for mkc under the contract. tta was, and is, entitled to wait until the end of the period to learn the extent to which Amerail would perform and then hold mkc responsible for its shortfall.

The shoe is on the other foot in tta's cross-appeal, invoking para.4 of the contract: "mkc agrees to treat tta as a most preferred vendor for other work over the next five (5) years." Now it is tta that argues ambiguity and the need for a trial. "Most preferred vendor" certainly has a broad range of possible meanings. The one tta prefers is that it was to receive a "last look" at all bid opportunities within the scope of its operations. In other words, before mkc (or Amerail) let a subcontract that tta could perform, tta was to have the chance to match the low bid; and if it did this tta was to receive the contract. According to tta, some $77 million of subcontracts that mkc and Amerail awarded from 1993 through 1998 fit that description. On tta'sunderstanding of what para.4 means, mkc broke its promise; neither mkc nor Amerail (after the delegation in 1995) even once offered tta an opportunity to meet another subcontractor's bid. But this does not matter unless tta can show damages, and the district court held that it could not do so.

Challenged by mkc to show even one subcontract (out of the whole $77 million) on which it could have made a profit by matching the low bid, tta has been reduced to silence. Although tta wants to avoid that burden, the party claiming injury from breach must establish the amount of damages. The demonstration need not be precise, see Oakleaf of Illinois v. Oakleaf & Associates, Inc., 173 Ill. App. 3d 637, 648-49, 527 N.E.2d 926, 933-34 (1st Dist. 1988), but the plaintiff must have a sensible basis for its claim. Subparagraph 3 of para.3 liquidates damages at 10% of the shortfall; para.4 omits that crutch. tta's submission that it had a profit margin of 15% on its subcontracts does not establish that it would have had that, or any, margin if it had to match the lowest bid on contracts within the scope of para.4. There is no point in litigating a case if the plaintiff is unprepared to demonstrate loss, so the district court was right to grant summary judgment to mkc with respect to para.4.

Illinois provides for prejudgment interest at 5% per year on "all moneys after they become due on any . . . instrument of writing". 815 ILCS 205/2.

This contract was an "instrument of writing". mkc relies on a judicial gloss limiting interest to situations in which the amount due was liquidated or readily ascertainable. See Alguire v. Walker, 154 Ill. App. 3d 438, 448, 506 N.E.2d 1334, 1341 (1st Dist. 1987). The liquidated-damages clause in para.3 subparagraph 3 satisfies this requirement. See Residential Marketing Group, Inc. v. Granite Investment Group, 933 F.2d 546, 549-50 (7th Cir. 1991) (Illinois law). Although para.3 contains variables that could have led to disputation--how much work did Amerail "lose" by customers' cancellation of orders, for example, and how much in "offsetting projects" did Amerail generate?--the parties were able to work this out for themselves once the district court concluded that mkc is liable for Amerail's shortfall in performance. mkc contends that because its liability was not foreordained it may not be required to pay interest. This is not so; it is uncertainty of amount owed, rather than uncertainty about liability, that would preclude an award of prejudgment interest. See Ash v. Georgia-Pacific Corp., 957 F.2d 432, 439 (7th Cir. 1992) (Illinois law); New Hampshire Insurance Co. v. Hanover Insurance Co., 296 Ill. App. 3d 701, 709, 696 N.E.2d 22, 28 (1st Dist. 1998). Anyway, if it mattered, we would be inclined to say that mkc's liability was foreordained. Its definition of "lose" was farfetched, its four affirmative defenses feeble.

Affirmed